UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY BAXTER,

       Plaintiff,                       Civil Action No. 16-13661

          v.                    District Judge Matthew F. Leitman
                                    Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

    Plaintiff Sherry Baxter ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).   For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #26] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #22] be DENIED.

## PROCEDURAL HISTORY

    On April 22, 2014, Plaintiff applied for DIB, alleging disability as of September 1, 2004 (Tr. 127).  Following the initial denial of benefits, Plaintiff requested an administrative

hearing, held on July 10, 2015 in Baltimore, Maryland (Tr. 25).    Laureen Penn, Administrative Law Judge ("ALJ") presided.  Plaintiff, represented by attorney Robert Soto, testified by teleconference from Toledo, Ohio (Tr. 11, 29-44). Vocational Expert ("VE") Mr. Reyes also testified (Tr. 45-49).  On August 10, 2015, ALJ Penn found Plaintiff not disabled as of the date last insured ("DLI") for DIB of December 31, 2010 (Tr. 11-20).  On August 11, 2016, the Appeals Council denied review (Tr. 1-3). Plaintiff filed suit in this Court on October 14, 2016.

### BACKGROUND FACTS

Plaintiff, born August 4, 1960, was 50 when her entitlement to DIB expired on December 31, 2010 (Tr. 20, 127).   She completed 12th grade and worked previously as a customer service representative, distribution clerk, janitorial worker, and mail carrier (Tr. 164).  She alleges the onset of disability prior to December 31, 2010 as a result of joint replacements in both feet and back pain (Tr. 163).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She lived in Temperance, Michigan with her husband (Tr. 29).  She was able to read, write, and manage her own finances (Tr. 29).  She stopped working in 2004, before which time she worked part time as a clerk for the post office (Tr. 30).  Earlier in her career, she worked as a postal carrier, but switched positions due to hand numbness resulting from Raynaud's disease (Tr. 31).  During her stint at the post office, she took a leave of absence

due to Carpal Tunnel Syndrome ("CTS") (Tr. 33). Her former work also included work at a craft store (Tr. 32).

Plaintiff was unable to work due to joint problems including knee and hand pain and swelling (Tr. 33). She currently used a pain patch for back and shoulder pain and Neurontin for nerve pain (Tr. 33). She also used Percocet "as needed" (Tr. 34). She attributed her lower back pain to a 2004 car accident (Tr. 34, 36). The back was variously "burning," "sharp," and "sore and achy" (Tr. 37). The back pain was exacerbated by sitting for long periods, walking, bending, and lifting (Tr. 37). She experienced some degree of relief from changing positions (Tr. 37). On a scale of one to ten, her back pain ranged from a "three or four" to a "seven" (Tr. 37). She was terminated by the post office 10 days after undergoing January, 2006 back surgery (Tr. 34).

Plaintiff underwent seven foot surgeries (Tr. 34) and Carpal Tunnel release surgery in both hands (Tr. 35). She experienced regular foot pain and numbness (Tr. 38). She experienced intermittent hand pain, noting that the hand condition waxed and waned with the temperature and humidity changes changes (Tr. 38). She also experienced neck pain due to the car accident (Tr. 36).

Plaintiff was able to dress herself, make the bed, and do some vacuuming (Tr. 39). She was able to walk for up to an hour without discomfort (Tr. 39). She was able to sit for up to two hours but required position changes at least every 30 minutes (Tr. 40). She was able to perform limited stooping, kneeling, and crouching (Tr. 40). She was able to lift up

to 20 pounds (Tr. 40).  She experienced problems bending and gripping (Tr. 41).  Her physical problems affected her mental health but she was reluctant to pay for psychological treatment (Tr. 41-42).  At present, she saw a family doctor as well as pain, orthopedic, hand, skin, and rheumatological specialists (Tr. 42).

On a typical day, she arose at 9:00 a.m., watched television, took a shower, ran errands, took care of her granddaughter, "scrap booked," and performed household and laundry chores (Tr. 42).  Since ceasing work in 2004, she had attempted to find work, but noted that the jobs she applied for required her to lift up to 40 pounds (Tr. 43).

### B.    Medical Evidence

### 1.  Treating Sources[1]

On July 30, 2004, Plaintiff sought emergency treatment for neck, back, and left shoulder pain following a car accident (Tr. 227).  Imaging studies of the lumbar spine were unremarkable (Tr. 228).  An MRI of the cervical spine shows mild narrowing at C4-C5 and mild compression at C6-C7 (Tr. 252).  Physical therapy records for the next month show "fair" progress (Tr. 242).  Physical therapist Amy C. Morris noted "fair" prognosis (Tr. 248).  A September, 2004 CT of the brain was unremarkable for either brain or cervical spine abnormalities (Tr. 225).  Neurological surgeon Patrick W. McCormick, M.D. noted full strength in all extremities (Tr. 373).

---

[1]Treating evidence related to Plaintiff's condition significantly after December 31, 2010, while reviewed, is not included in the present discussion.

-4-

A February, 2005 MRI of the lumbar spine showed a small annular tear at L4-L5 and mild disc space narrowing at L5-S1 (Tr. 253). Gregory M. Thomas, M.D. stated that he was "not very optimistic" about Plaintiff returning to work (Tr. 275-276, 1021-1022). He noted that Plaintiff was "far from being able to meet her job requirements at the post office" (Tr. 275, 1021). Plaintiff underwent an epidural injection in April, 2005 (Tr. 280, 282). Plaintiff reported level "six" to "nine" out of ten pain and difficulty climbing stairs and sitting for prolonged periods (Tr. 282). In June, 2005, Dr. Thomas found that Plaintiff was limited to lifting five pounds infrequently and standing and/or walking occasionally (Tr. 277). He found that Plaintiff could sit constantly but was limited to infrequent bending and crawling; occasional kneeling; frequent stair climbing; but was precluded from all squatting (Tr. 277). He precluded Plaintiff from all use of arm or leg controls (Tr. 277). October, 2005 records note Plaintiff's report of escalating back pain (Tr. 369). She demonstrated full strength in all extremities (Tr. 369). In November, 2005, Plaintiff underwent epidural injections (Tr. 250). A CT of the lumbar spine from the same month showed only mild disc bulges (Tr. 256, 283).

In January, 2006, Plaintiff underwent a lumbar fusion at L5-S1 (Tr. 301). She underwent followup physical therapy between April and June, 2006 (Tr. 315-346). In May, 2006, Plaintiff reported good results from the surgery (Tr. 359). Imaging studies of the lumbar spine from the same month were unremarkable (Tr. 1070, 1127). Dr. McCormick noted that Plaintiff was capable of lifting 70 pounds occasionally and 40 to 50 repetitively

(Tr. 359). An August, 2006 MRI of the lumbar spine was unremarkable (Tr. 388, 415, 995). The same month, John S. Carroll, D.P.M. noted that Plaintiff required a metaphyseal osteotomy (Tr. 503). An EMG of the lower extremities from the same month was consistent with radiculopathy related to L3, L4, and L5 (Tr. 390, 417, 997). In September, 2006, Dr. McCormick noted Plaintiff's complaint of chronic left leg and foot discomfort (Tr. 356). Clinical neurological testing and range of motion studies were wholly normal (Tr. 356). Dr. McCormick noted that an EMG suggested "an abnormality of the nerve" (Tr. 357). The same month, Ted E. Barber, M.D. noted Plaintiff's report of lower extremity symptoms (Tr. 382, 1012-1015). He noted that a recent EMG showed "mild radiculopathy changes involving L3, L4, and L5" (Tr. 382, 413).

In January, 2007, Plaintiff reported continued back pain (Tr. 400). Plaintiff sought treatment for dermatitis in March, 2007 (Tr. 1010). In April, 2007, Patrick Schafer, M.D. encouraged Plaintiff to apply for work for "at least" the purpose of "exercising in terms of walking on a daily basis" (Tr. 1820). Dr. Carroll's June, 2007 records note good alignment after followup foot surgery (Tr. 502). Plaintiff requested and received a prescription for Vicodin (Tr. 502). In January, 2008, Dr. Carroll prescribed an orthopedic shoe (Tr. 500). Dr. Carroll's January and August, 2008 records also note good alignment after a followup foot surgery (Tr. 498-500, 1006). Dr. Carroll's March, 2008 records note that Plaintiff could use regular shoes (Tr. 497). In December, 2008, Plaintiff reported that she had recently gone to Disney World and had been able "to push her disabled friend around the park with a

-6-

wheelchair," due to the use of epidural injections (Tr. 1805).

In January, 2009, Plaintiff reported renewed foot pain (Tr. 496). Plaintiff underwent toe surgery in March, 2009 (Tr. 494). Imaging studies of the left hip were unremarkable (Tr. 1073). In March, 2009, Plaintiff reported that an epidural injection on February 24, 2009 allowed her to take a trip to Florida to visit friends (Tr. 1828). October, 2009 records note that Plaintiff's condition was "quite stable" and that she experienced only mild pain (Tr. 1803). In November, 2009, an ultrasound of the gallbladder was negative for abnormalities (Tr. 714). In December, 2009, Plaintiff requested a "total joint procedure" of the left foot (Tr. 492). Followup records show good results (Tr. 492). The same month, Plaintiff noted that she had "shopping, baking, [and] family activities to prepare" before Christmas (Tr. 956, 1832).

March, 2010 treating records state that Plaintiff requested a renewed prescription for pain medication (Tr. 489, 1873). She reported that she was leaving for Florida the following week (Tr. 1873). April, 2010 nerve conduction studies of the lower extremities were unremarkable (Tr. 721, 1911). Muscle strength testing was normal (Tr. 1911). In July, 2010, Plaintiff reported pain in both feet (Tr. 490). In July, 2010, she reported level "two to three" pain on a scale of one to ten and that she was doing "relatively well" (Tr. 953, 1799). EMG studies of the lower extremities were unremarkable (Tr. 953). Dr. Carroll's November, 2010 record note Plaintiff's report that she did not require as much pain medication as formerly prescribed (Tr. 487). Plaintiff noted that she had just acquired a Australian sheep dog puppy

(Tr. 487).

In February, 2011, Plaintiff reported shoulder, hip, foot, and thumb pain as well as "chronic" back pain (Tr. 609). Imaging studies of the left shoulder showed only minor degenerative changes and "tiny spurs" (Tr. 1077, 1151, 1695, 1763). An MRI from the following month was essentially unchanged from a 2006 study (Tr. 950, 1079-1080, 1693). Imaging studies of the right wrist showed only minor degenerative changes (Tr. 1081, 1752). In April, 2011 Dr. McCormick noted Plaintiff's report of continued low back pain (Tr. 434). Plaintiff reported that she "enjoy[ed] baking very much and is on her feet for several at a time doing this and she indicates that that is when the pain becomes the greatest" (Tr. 434, 1682). He noted that since seeing Plaintiff in 2006, she had undergone several foot surgeries (Tr. 434). He noted full muscle strength in all extremities (Tr. 435, 1683). The same month, Dr. Carroll noted good results from recent arthroplasty surgery (Tr. 486). Pain management specialist Elizabeth Fowler, M.D. noted that Plaintiff maintained "an active lifestyle, but [had] to alter" what she did "because of pain" (Tr. 1677). Imaging studies of the lumbar spine were unremarkable (Tr. 1692). In June, 2011, Plaintiff reported recent "digging and moving rocks" (Tr. 827, 945). In August, 2011, Plaintiff reported an injury after losing control of a pony she was walking (Tr. 825, 939, 1644). She reported "a very active lifestyle" (Tr. 825). September, 2011 records note "clinical evidence" of tenosynovitis of the right thumb requiring a steroid injection (Tr. 824). The following month Plaintiff reported limited improvement (Tr. 1149). December, 2011 pain management records note her report

that she continued to "stay active" (Tr. 815).

An unsigned, June 4, 2014 "Residual Functional Capacity Form" states that Plaintiff underwent multiple foot surgeries between August, 2002 and February, 2011 for which she received injections and took pain medication (Tr. 1186). The assessment states that Plaintiff experienced the "inability to stand or walk any distance due to pain" and had "severe restriction of motion" due to bunions (Tr. 1186). The assessor stated that Plaintiff was unable to "continue or resume work at current or previous employment" but that Plaintiff was able to do "anything seated but this might irritate her back condition" (Tr. 1187).

## 2. Non-Treating Sources

In October, 2007, Moises Alviar, M.D. examined Plaintiff on behalf of the SSA, noting Plaintiff's report of neck and back pain following a July, 2004 car accident (Tr. 424). Dr. Alviar noted a normal gait, but difficulty bending and squatting (Tr. 425, 429). He noted "problems with straight leg raising" and a reduced range of lumbar spine motion (Tr. 426-427).

In July, 2014, E.D. Choi, M.D. performed a non-examining review of the treating and consultative records, finding that for the relevant period, Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for around six hours in an eight-hour workday; and push and pull without limitation (Tr. 60). He found that Plaintiff was limited to occasional postural activity (Tr. 61).

### C. Vocational Expert Testimony

VE Reyes classified Plaintiff's past relevant work as a mail carrier as semiskilled and exertionally medium and work as a mail clerk, unskilled/light[2] (Tr. 45-46). ALJ Penn then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, and work experience with the following limitations:

> [Able] to lift and carry 20 pounds occasionally, 10 pounds frequently. They could stand and walk for four to six hours. They can sit for six hours. They can occasionally stoop, crouch, kneel and crawl. They can occasionally climb stairs and ramps. They can never climb ladders, ropes or scaffolds. They can frequently finger and handle. they would need to avoid concentrated exposure to weather extremes, like heat, cold and humidity. So, would this hypothetical person be able to do any of the past relevant work of the claimant? (Tr. 46).

The VE testified that the above limitations would allow for the past relevant work as a mail clerk as well as the other light, unskilled work of a garment sorter (400,000 positions in national economy); tag inserter (350,000); and labeler (100,000) (Tr. 47-48). The VE testified further that if the same individual required a sit/stand option every hour for three to five minutes, the job numbers would remain unchanged (Tr. 48). He found that the

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

additional limitation of missing one day of work each month *might* eliminate all competitive employment and that missing two or more days of work a month would definitely preclude all employment (Tr. 48). He testified that the need to be off task for 10 percent of the day would not effect the job numbers but the need to be off task 15 percent of the day would preclude all employment (Tr. 48). He stated that the job numbers would not be affected if the hypothetical individual were additionally "limited to simple, routine work involving one to two steps" with "occasional interaction with supervisors . . . coworkers and the public (Tr. 48).

In response to questioning by Plaintiff's attorney, the VE testified that if the individual were limited to handling and fingering occasionally, all work would be precluded (Tr. 49).

### D.  The ALJ's Decision

Citing the medical records, ALJ Penn found that during the period prior to December 31, 2010, Plaintiff experienced the severe impairments of degenerative disc disease of the cervical and lumbar spine and dysfunction in major joints but that the impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 13). The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally light work for the relevant period with the following non-exertional limitations:

> [S]tand/walk for four to six hours of an eight-hour workday. The claimant would need a sit/stand option every hour for three to five minutes. The claimant can never climb ladders, ropes or scaffolds, can occasionally climb ramps and stairs, and can occasionally kneel, stoop, crouch and crawl. The

claimant is limited to frequent fingering and handling.  The claimant would need to avoid concentrated exposure to [weather] extremes, such as heat, cold, and humidity (Tr. 14).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the work of a garment sorter, tag inserter, and labeler (Tr. 19, 47-48).

The ALJ discounted Plaintiff's allegations of disability for the relevant period, citing April, 2007 and September, 2009 records showing only "mild" symptomology (Tr. 16-17). She cited October, 2007 consultative examination records noting a normal gait and a full range of motion in all joints (Tr. 17).  She noted that in 2008, Plaintiff went to Disney World with friends and was able to push her disabled friend around the park in a wheelchair (Tr. 17).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.

-12-

1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-13-

## ANALYSIS

### A.  Dr. Choi's July, 2014 Non-Examining Assessment

In support of a remand for either benefits or further fact-finding, Plaintiff argues first

that the ALJ erred by according controlling weight to Dr. Choi's July, 2010 finding that she

could perform a range of exertionally light work.  *Plaintiff's Brief,* 6-8, *Docket #22,* Pg ID

2069.  Plaintiff contends that while Dr. Choi purportedly reviewed the findings of treating

physician Dr. Thomas, Dr. Choi's "light work" conclusion ignored Dr. Thomas' finding that

she had a "poor" prognosis.  *Id.* at 6 (*citing* Tr. 276).  Plaintiff argues that the deficiencies

in Dr. Choi's findings taint the ultimate finding that she could perform light work.  *Id.* at 6-7.

Plaintiff's contention that Dr. Choi overlooked critical portions of Dr. Thomas'

records is without merit (Tr. 57-58).  Dr. Choi stated that he reviewed Dr. Thomas' February

to December, 2005 records (Tr. 57).  While Dr. Choi was under no obligation to quote the

treating findings verbatim, he acknowledged that (1) Dr. Thomas found that Plaintiff was

unable to return to her former job (Tr. 267) and, (2) Dr. Thomas  stated that he was unable

to find a job for Plaintiff in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 55-56 *citing*

Tr. 267, 275-276).  Dr. Choi noted that Dr. Thomas' statement that he was unable to find a

job in the *DOT* could be interpreted to state "there is nothing in there that recommends light,

or sedentary, or [medium' work for this individual" (Tr. 55-56).  While Plaintiff argues that

Dr. Thomas' statement that he was "not overly optimistic" about her ability to return to work

amounts to a "disability" opinion,  Dr. Thomas' comments, read in context, do not equate

with a finding of disability (Tr. 270).  He prefaced his "not overly optimistic" statement by noting that Plaintiff declined a recommendation for an epidural the following week because she "had a planned vacation" that was "already paid for" (Tr. 270).  Dr. Thomas noted that he "would have a hard time defending [Plaintiff] from the post office and its wrath if she is just dragging her feet" (Tr. 270).

Even to the extent that Dr. Thomas' remarks can be construed as a disability opinion, Dr. Choi noted that the records created from January, 2006 forward supported the finding that Plaintiff could perform light work (Tr. 57).  Dr. Choi noted that Plaintiff underwent a spinal fusion on January 10, 2006 and that followup clinical and imaging studies showed either mild or wholly unremarkable results (Tr. 57-58).   His summation of the subsequent treating records, while succinct, is consistent with my own review of the medical transcript.

 Plaintiff's briefing segues into a criticism of the ALJ's accord of "great weight" to Dr. Choi's opinion and only "some weight" to Dr. Thomas' opinion.  *Id.* at 7.  Plaintiff is correct that the regulations in effect at the time of Plaintiff's application requires that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight."*Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)); SSR 96–2p, 1996 WL 374188, *5 (1996).[3]

---

[3]

The administration rescinded SSR 96-2p on March 27, 2017. *See* Rescission of Social

However, the ALJ did not err in according only some weight to Dr. Thomas' findings (Tr. 18). She cited Dr. Thomas' April, 2005 observation that "[t]here was no light duty" work available at the post office; therefore, Plaintiff was required to go back to her former work (performed at the heavy or medium exertional level) "or nothing" (Tr. 18 *citing* 269). The ALJ's conclusion that Dr. Thomas' comments implied the ability to perform light work is not unreasonable (Tr. 18). Plaintiff also faults the ALJ for failing to cite Dr. Thomas' statement Plaintiff "was not going to get better;" and that Dr. Thomas could not "find a specific job description" or "a specific reference to a category of work within the [*DOT*]" for her (Tr. 267). However, Dr. Thomas' statement that Plaintiff was "not going to get better" or that he was unsuccessful in finding a job in the *DOT* matching Plaintiff's occupational abilities is not entitled to the deference of a treating source "opinion." Even assuming that Dr. Thomas's generalized remarks were intended to convey his belief that Plaintiff was disabled, they do not carry the weight of a treatment "opinion" and are not entitled to deference. The Commissioner, not a treating source, is responsible for deciding whether a claimant meets "the statutory definition of disability." 20 C.F.R. § 404.1527(d)(1); *see also Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 538 (6th Cir. 1981)("broad conclusory

---

Security Rulings 96-2p, 96-5p, and 06-3p, 82 FR 15263-01 (Mar. 17, 2017). Under the new rules, ALJs will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520b; 416.920c. The "new rules, however, apply only to claims filed on or after March 17, 2017." *Hancock v. CSS, 2017 WL 2838237,* at *8 (W.D. Mich. July 3, 2017)(*citing* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01 (Jan 18, 2017)). Because current Plaintiff filed his claim well before March 17, 2017, SSR 96-2p applies.

formulations, regarding the ultimate issue which must be decided by the Secretary, are not determinative of the question of whether or not an individual is under a disability").

Plaintiff's overlapping argument that Dr. Thomas' statements were automatically entitled to more weight than Dr. Choi's non-examining records does not provide grounds for remand. To the contrary, "'[i]n appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources.'" *Brooks v. Commissioner of Social Sec.*, 531 Fed.Appx. 636, 642 (August 6, 2013)(*citing* SSR 96–6p, 1996 WL 374180, at *3 (1996)). "One such instance is where the 'State agency medical or pychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.'" *Id.*

The reasoning in *Brooks* is applicable here. Dr. Thomas' 2005 statements do not have benefit of the records created from January, 2006 through the end of the relevant period whereas Dr. Choi reviewed extensive treating and consultative records through the first half of 2014. The evidence considered by Dr. Choi includes findings from January, 2006 forward by Plaintiff's neurological surgeon, podiatrist, and pain specialists showing either mild or unremarkable findings. The evidence reviewed by Dr. Choi includes the neurological surgeon's May, 2006 opinion that Plaintiff was capable of lifting 70 pounds occasionally and 40 to 50 repetitively (Tr. 359); April, 2007 records showing that another treating source

encouraged Plaintiff to apply for work for "at least" the purpose of "exercising in terms of walking on a daily basis" (Tr. 1820); and Dr. Carroll's June, 2007 records noting good alignment after followup foot surgery (Tr. 502). As discussed below, these records also show that Plaintiff was able to engage in activities consistent with the ability to perform exertionally light work. For these reasons, the ALJ did not err in according "great weight" to Dr. Choi's findings and only partial weight to Dr. Thomas' findings.

### B. The Credibility Determination

Plaintiff argues next that the ALJ "improperly evaluated" her "subjective statements regarding pain and other symptoms." *Plaintiff's Brief* at 8-9.

Plaintiff's two-page "credibility determination" argument is composed entirely of case law and regulatory "boilerplate." It does not contain even one example of how the ALJ erred in rejecting her allegations of limitation. My own review of the credibility determination does not reveal either substantive or procedural error. The ALJ cited treating records from May, 2006 showing that Plaintiff was doing "much better" following fusion surgery (Tr. 16). She noted that an MRI of the lumbar spine was unremarkable (Tr. 16). She acknowledged that August, 2006 EMG studies showed some degree of lower extremity involvement but noted that Plaintiff obtained relief from Lyrica (Tr. 16). She cited April, 2007 "mild" clinical findings (Tr. 16). The ALJ noted that Plaintiff's back, shoulder, foot, and hand complaints were adequately addressed with conservative treatment (Tr. 17). She noted that despite the lack of evidence supporting Plaintiff's allegations of manipulative limitations, the RFC

limited her to frequent rather than constant fingering and handling (Tr. 14, 17).  The ALJ noted that Plaintiff's claim of disability was undermined by her ability to travel to Disney World in November, 2008 and push "a disabled friend around the park in a wheelchair (Tr. 17, 1805).

My own review of the record supports the ALJ's conclusion that Plaintiff's claims of disability were not wholly credible.  As early as April, 2005, Dr. Thomas noted that Plaintiff's decision to postpone a steroid injection to take a prepaid vacation with her husband undermined the disability claim (Tr. 270).  While Plaintiff alleges the inability to perform exertionally light work, the records show that she traveled to Florida (again after the "Disney World" trip) in March, 2009 to visit friends (Tr. 1828).  In October, 2009, she reported only "mild" pain (Tr. 1803).  December, 2009 records state that Plaintiff planned to shop, bake, and prepare family activities during the holidays (Tr. 956).  March, 2010 records state that Plaintiff was returning to Florida the following week (Tr. 1873).  She acquired a Sheepdog puppy in November, 2010 (Tr. 487).  In April, 2011, Plaintiff reported that she "enjoy[ed] baking very much" and was "on her feet for several hours at a time . . ." (Tr. 434).  Plaintiff exhibited full muscle strength in all extremities (Tr. 435).  In June, 2011, Plaintiff reported "digging and moving rocks" and in August of the same year, noted that she had been walking a pony at the time she sustained an injury (Tr. 825, 827).  Treating sources note repeatedly that Plaintiff maintained "an active lifestyle" despite complaints of ongoing pain (Tr. 815, 825, 1677). The evidence showing at most mild back, foot, and upper

extremity conditions, coupled with Plaintiff's regular activities, supports the ALJ's credibility determination. *See Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990)("[T]he ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations ... and the objective medical evidence contradict each other"). As such, the deference accorded an ALJ's credibility determination is appropriate here. *See Cruse v. CSS*, 502 F.3d 532, 542 (6th Cir. 2007)("ALJ's credibility determinations about the claimant are to be given great weight").

## C. The Residual Functional Capacity

For overlapping reasons, the ALJ's finding that Plaintiff could perform a significant range of light work should not be disturbed.  Plaintiff argues that the RFC for light work stands at odds with the ALJ's later finding that Plaintiff was unable to perform any of her former work including her light, unskilled work as a mail clerk. *Plaintiff's Brief* at 10-11 (*citing* Tr. 18).

This argument is a red herring.  In response to the original hypothetical question describing a range of light work, the VE testified that Plaintiff could perform either her former job as a mail clerk or the "other" work of a garment sorter, tag inserter, or labeler (Tr. 47).  The ALJ then asked the VE if the need for "a sit/stand option" would allow the individual to perform "the three jobs you gave me," apparently declining to inquire whether the sit/stand option would effect the mail clerk position (Tr. 48).  The VE responded that the sit/stand option would not effect the three "other" positions but did not mention the former

mail clerk position (Tr. 48). It is therefore unknown whether the addition of a sit/stand option would preclude Plaintiff's former work as a mail clerk. While the ALJ's finding that Plaintiff "was unable to perform any past relevant work" should more accurately state "it is undetermined whether Plaintiff can perform her former work," this does not undermine the ALJ's ultimate finding, supported by the vocational testimony, that Plaintiff was capable of a significant range of other light, unskilled work (Tr. 19-20). Notably, Plaintiff does identify any deficiencies in hypothetical question to the VE or the ultimate RFC forming the basis for the Step Five determination.

Because the ALJ's determination is supported by substantial evidence and is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #26] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #22] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: May 31, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on May 31, 2018, electronically and/or by U.S. mail.

s/Sandra Osorio
Acting Case Manager to the
Honorable R. Steven Whalen